**Affirmed and Memorandum Opinion filed August 14, 2012.**



**In The**

# Fourteenth Court of Appeals

---

## NO. 14-11-00122-CR

---

**REGINALD TYRRELL PRICE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 263rd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1268303**

---

## MEMORANDUM OPINION

Appellant, Reginald Tyrrell Price, appeals his conviction of capital murder. In four issues, appellant contends the evidence is legally insufficient to support his conviction and the trial court erred by violating appellant's right to jury unanimity and denying appellant's motion to suppress his custodial statement. We affirm.

### I. BACKGROUND

During August 2008, appellant traveled from Dallas to Houston to visit his cousin, Jacoby Hall. While in Houston, appellant and Hall associated with sisters Donna and

Danyell Thomas. The evidence is conflicting regarding whether appellant or Hall was dating Donna in August 2008.

Desiree Jarmon lived in Houston and knew the Thomas sisters. Desiree testified as follows regarding the events underlying this case. On August 14, 2008, Donna called Desiree and asked her to arrange a transaction whereby Donna and appellant would obtain drugs. Desiree contacted Varn Butler, a local drug dealer colloquially known as "Hop," and told him to call Donna. A few hours later, Donna informed Desiree that Hop had taken her money but never returned with the drugs. Desiree unsuccessfully attempted to contact Hop. Desiree then went to Donna's house, where Danyell, Hall, and appellant were gathered. Desiree wanted to "let them know that [she] wasn't in on [Hop's theft]."

Donna appeared nervous and upset about the theft. Appellant paced back and forth, repeatedly yelling, "I'm not taking no losses." Appellant ran up to Desiree, pointed a revolver in her face, and told her to show him locations frequented by Hop. Desiree agreed. A few minutes later, Donna suddenly began hitting Desiree. Danyell and Hall joined the assault, but appellant did not. During the altercation, Desiree's cell phone fell to the ground and was retrieved by appellant.

After allowing Desiree to clean her injuries and change clothing, all five individuals entered Desiree's car and began looking for Hop. They drove to several locations, including Lyons Apartments, but did not find Hop and suspended their search for the evening. That night, Desiree stayed at Donna's house because Desiree did not want her mother to see her injuries.

The next day, Desiree asked appellant to return her cell phone. Appellant told Desiree he would return her phone if she would take him to the same locations where they had searched for Hop the previous day. Desiree agreed and drove with her brother to Donna's house. Donna and appellant then rode with Desiree and her brother, while Hall and Danyell followed in a separate car. They returned to Lyons Apartments and

2

spoke with a pregnant woman who told them where Hop might be located. Appellant then returned Desiree's cell phone and allowed her to drive away in her car.

During August 2008, James Williams lived in a unit at Lyons Apartments with various family members, including his "noticeably pregnant" girlfriend Kindra Trotter. Williams and Trotter provided the following testimony.[1] The day before William Jones (the "complainant") was killed, appellant and Hall[2] visited Lyons Apartments and told Williams and Trotter they were looking for Hop because he had stolen money from them. According to Trotter, appellant said "we can be rude and come in this motherf***er and make everyone lay down, but we['re] not doing that. We coming to y'all correct, . . . asking ya'll like normal people . . . who is Hop and where he is." Appellant also lifted his shirt to reveal the gun tucked into his waistband. After Williams and Trotter stated they did not know Hop's location, appellant and Hall left.

Later that evening, appellant and Hall, accompanied by Donna and Danyell, returned to Williams's apartment.[3] Appellant asked Williams and Trotter if they knew where "Marcus" lived, referring to Marcus Smith. Williams and Trotter responded affirmatively. According to Williams, appellant then drew his gun and said, "[G]et your motherf***ing ass in the car." Williams and Trotter complied, and the group drove to Marcus's house. After appellant and Hall exited the car, Donna and Danyell drove away with Williams and Trotter to a gas station and then to Williams's apartment. Williams exited the car, but the women drove away with Trotter still in the car.

Donna, Danyell, and Trotter returned to Marcus's house. Trotter was sitting in the car when she heard three gunshots. Donna or Danyell told Trotter to lower her head.

---

[1] For purposes of this opinion, it is unnecessary to note all inconsistencies between Williams's testimony and Trotter's testimony.

[2] Williams and Trotter never specifically testified that the other man who accompanied appellant was Hall. However, they both described the other man as short in stature with braided hair, which matched Hall's description.

[3] Neither Williams nor Trotter identified the women as Donna and Danyell, but the evidence supports such an inference.

Appellant and Hall returned to the car and stated they had stolen cell phones and a wallet. The group drove away and shortly thereafter ordered Trotter to exit the car.

Marcus testified as follows regarding the events that occurred inside his house. Marcus was lying on the couch in his living room when someone knocked on the front door. Appellant and Hall[4] then kicked open the door and pointed guns at Marcus's head. Appellant was holding a semiautomatic handgun; Hall was holding a revolver. The men told Marcus they were looking for Hop. After Marcus responded he did not know where Hop was, the men stated they knew Hop had been seen with the complainant. Marcus replied that he knew the complainant but did not have his phone number. However, the men discovered the complainant's phone number in Marcus's cell phone. At Hall's order, Marcus called the complainant and invited him to Marcus's house.

When the complainant arrived, appellant and Hall pointed their guns at him and ordered him to sit on the couch next to Marcus. Appellant and Hall then questioned the complainant regarding Hop. The complainant denied having been with, or even knowing, Hop. It was apparent that the complainant was being dishonest, and appellant and Hall called the complainant a liar.

Marcus's friend, Charles Patterson, unexpectedly knocked on the door. Appellant and Hall allowed Charles to enter, then pointed guns at him and made him stand in the corner. After questioning, Charles stated that he was unaware of Hop's whereabouts. Appellant and Hall became frustrated by the lack of cooperation. Appellant fired a warning shot and said, "You think we're playing games[?]" At this point, Marcus believed they were "going to get killed."

Appellant peered out the front-door peephole. The complainant then stood up and began wrestling appellant for possession of his gun. Marcus attempted to take Hall's gun but withdrew when Hall pointed the gun at him. According to Marcus, Hall assisted appellant wrestle the complainant for possession of appellant's gun; as they wrestled,

---

[4] Again, Marcus did not identify Hall by name but provided a description that matched Hall's appearance.

appellant and Hall pointed the gun at the complainant's stomach and fired. The complainant fell to the ground. Marcus testified that at least two more shots were fired at the complainant and "from what [Marcus saw,] it had to be the semiautomatic [that was fired]," although he was not certain.

Charles's account of the shooting differed. According to Charles, the complainant began wrestling appellant for the gun but slipped and fell on the floor. Appellant and Hall then fired several shots at the complainant. Specifically, Charles observed appellant point the gun at the complainant and fire multiple shots.

Marcus told the men to stop shooting and leave because someone likely heard the gunshots. Donna entered the house and told appellant and Hall to "kill all of 'em." Instead, appellant and Hall took Marcus's cell phone and identification card and Charles's identification card and instructed them not to call 9-1-1 until after appellant and Hall left. According to Charles, appellant and Hall also told Charles and Marcus to touch the complainant, apparently in order to place their fingerprints on him. Appellant, Hall, and Donna then exited the house. A neighbor called 9-1-1. Shortly thereafter, paramedics arrived and placed the complainant in an ambulance. The complainant died en route to the hospital.

The following day, Hall called Trotter and asked her and Williams to meet him and appellant. Trotter agreed to meet the men at a nearby washateria. After everyone arrived, appellant inquired whether Williams or Trotter had heard anything about what happened at Marcus's house. The group then discussed the fact that the complainant had been killed. Referring to the complainant, appellant said, "I had to shoot him, that motherf***er tried to wrestle with me" and "[I] shot [the complainant] in the side and . . . he . . . fell." According to Trotter, appellant asked her and Williams to give anyone who inquired a false description of appellant and Hall. Appellant also warned Williams and Trotter not to speak to police or they would "get a package at [their] door."

HPD officers testified as follows regarding their investigation of the crime scene. There had been a "forced entry" into Marcus's house through the front door. The front

5

door led into the living room, where two .40 caliber casings and three fired bullets were found. Police never found any firearm associated with this case.

According to the medical examiner, the complainant sustained four gunshot wounds. First, the complainant sustained a contact gunshot wound (meaning the gun muzzle was placed against the complainant's body when fired) on the right side of his chest, with corresponding exit wounds on the left side of his back; this wound was fatal. Copper jacketing from the bullet that caused this wound was recovered from the complainant's back.

Second, the complainant sustained a contact gunshot wound on the right side of his abdomen, with a corresponding exit wound on the right side of his back; this wound could have been fatal. Copper jacketing from the bullet that caused this wound was recovered from the complainant's back.

Third, the complainant sustained a contact gunshot wound on the left side of his abdomen, with a corresponding exit wound on the left side of his back; this wound was fatal. This wound also was "through and through," meaning the bullet cleanly exited the complainant's body and no bullet fragments were recovered from the body.

Fourth, the complainant sustained a non-contact gunshot wound (meaning the muzzle of the gun was at least three feet away from the complainant's body when fired) on his left hip. This wound did not have a corresponding exit wound and was not immediately fatal. Fragments from the bullet that caused this wound were recovered from the complainant's left hip and thigh.

An HPD firearms expert analyzed the two casings and three bullets found at the crime scene and the bullet fragments recovered from the complainant's body. Two of the bullets recovered at the crime scene were from .38 caliber ammunition and were fired from the same gun. Additionally, the expert determined bullet fragments recovered from the gunshot wound to the complainant's left hip were from one or more bullets which

6

was discharged by the same .38 caliber gun that fired the .38 caliber bullets found at the crime scene.

The two casings and third bullet recovered at the crime scene were from .40 caliber ammunition. The expert determined the casings came from .40 caliber ammunition fired by the same gun. The expert also testified bullet fragments recovered from the gunshot wounds to the right side of the complainant's chest and abdomen did not come from a bullet fired by the same gun that fired the .38 caliber bullets. According to the expert, these findings meant that at least two guns were used to shoot the complainant. Although the expert was unable to determine whether these bullet fragments and the .40 caliber bullet were all fired from the same gun, markings on the fragments and bullet did not negate the possibility.

Eventually, police officers spoke with several witnesses who identified appellant as a person involved in the complainant's murder. During November 2008, appellant was arrested in Dallas pursuant to a capital-murder arrest warrant. HPD officers interviewed appellant at a Dallas Police Department station. During his custodial statement, appellant insisted he accidentally shot the complainant in the shoulder while he and appellant were wrestling for possession of the gun. According to appellant, Hall then straddled the complainant and shot him three times in the stomach. Appellant also testified that Hall later admitted he thought he killed the complainant.

A jury found appellant guilty of capital murder, and the trial court assessed the mandatory sentence of life imprisonment without possibility of parole.

## II. LEGAL SUFFICIENCY

In his first and second issues, appellant contends the evidence is legally insufficient to support the jury's findings that (1) he acted with specific intent to cause the complainant's death and (2) the complainant was killed while appellant was committing or attempting to commit a felony.

7

## A. Relevant Law and Standard of Review

A person commits the offense of capital murder if he intentionally commits murder "in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat[.]" Tex. Penal Code Ann. §§ 19.02(b)(1) (West 2011), 19.03(a)(2) (West Supp. 2011).

When reviewing sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We do not sit as thirteenth juror and may not substitute our judgment for that of the fact finder by re-evaluating weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* This standard applies equally to both circumstantial and direct evidence. *Id.* Our duty as reviewing court is to ensure the evidence presented actually supports a conclusion that the defendant committed the crime. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

## B. Analysis

In his first issue, appellant contends the evidence is insufficient to support a finding that he intentionally caused the complainant's death. A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code Ann. § 6.03(a) (West 2011). The murder element of capital murder is a result-of-conduct offense. *See Louis v. State*, --- S.W.3d ---, No. PD-0323-11, 2012 WL 2007632, at *5 (Tex. Crim. App. June 6, 2012).

8

Ample evidence supports a finding that appellant intentionally caused the complainant's death by shooting him. As discussed above, Charles observed appellant point his gun at the complainant and fire at least two times. Marcus's testimony corroborates this account. Further, Marcus testified that two firearms were used during the murder. The forensic evidence established that the complainant was shot twice in the right side of his chest and abdomen at close range by a different firearm than the .38 caliber gun used to shoot the complainant in the left hip.[5] .40 caliber casings were found at the crime scene, supporting a strong inference that appellant—who used a semiautomatic handgun which, unlike Hall's revolver, ejects casings—shot the complainant in the right side of his chest and abdomen. Additionally, Williams and Trotter testified that appellant told them he had shot the complainant because the "motherf***er tried to wrestle with me." This evidence supports a finding that appellant intentionally shot the complainant with intent to kill. *See Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. 1981) ("[W]here a deadly weapon is fired at close range and death results the law presumes an intent to kill."); *Draper v. State*, 335 S.W.3d 412, 415 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (same).

We also note that appellant's actions following the shooting demonstrate consciousness of guilt. Appellant and Hall instructed Charles and Marcus to touch the complainant, apparently in order to place their fingerprints on him. Appellant met with Williams and Trotter and told them to give a false description regarding appellant and Hall. Moreover, appellant warned Williams and Trotter not to speak to anyone about the incident or they would "get a package at [their] door." *See Guevara v. State*, 152 S.W.3d

---

[5] In addition to abating this appeal for the trial court to enter findings of fact regarding the voluntariness of appellant's custodial statement (as described in more detail below), we abated a second time at appellant's request based on the possibility that there had been a material mistake in the ballistics evidence presented at trial. On abatement, the State presented evidence establishing that the ballistics evidence contained several inaccuracies. Succinctly, the bullet fragments represented at trial to be associated with gunshot-wound one were actually retrieved from gunshot-wound two, and vice versa. The trial court considered this evidence and found the mistake was immaterial. Appellant has not filed additional briefing regarding this matter. We conclude the fact that ballistics evidence pertaining to gunshot-wounds one and two was muddled is immaterial for purposes of our sufficiency-of-the-evidence analysis because the evidence strongly supports a finding appellant caused both wounds.

9

45, 50 (Tex. Crim. App. 2004) (recognizing defendant's unusual conduct and attempt to conceal evidence raised inference regarding his intent); *Temple v. State*, 342 S.W.3d 572, 589–91 (Tex. App.—Houston [14th Dist.] 2010, pet. granted) (same). Accordingly, we overrule appellant's first issue.

In his second issue, appellant contends the evidence is insufficient to support the jury's finding that the murder occurred while appellant was committing or attempting to commit one of the felonies enumerated in the jury charge. As discussed in more detail below, the jury was instructed to find appellant guilty of capital murder if it determined the murder occurred while appellant was committing or attempting to commit one of the following seven separate felonies: burglary of Marcus's house (felony one); kidnapping of the complainant, Marcus, or Charles (felonies two through four); or robbery of the complainant, Marcus, or Charles (felonies five through seven). We hold the evidence is sufficient to support a finding that appellant murdered the complainant in the course of kidnapping him.

A person commits the offense of kidnapping if he intentionally or knowingly abducts another person. Tex. Penal Code Ann. § 20.03(a) (West 2011). The term "abduct" means to restrain a person with the intent to prevent liberation by either (1) secreting or holding him in a place where he is unlikely to be found, or (2) using or threatening to use deadly force. *See id.* § 20.01(2) (West 2011). "Restrain" means to restrict a person's movements without consent so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining that person. *See id.* § 20.01(1).

According to Marcus, appellant pointed a handgun—which an officer described as a deadly weapon—at the complainant and forced him to enter the house and sit on the couch next to Marcus. Marcus testified that he believed the complainant was being restrained by appellant's use of the gun. Furthermore, appellant fired his gun in a threatening manner and said, "You think we're playing games[?]" This evidence supports a finding that appellant threatened deadly force to interfere substantially with the

10

complainant's liberty by moving him into Marcus's house and onto the couch. *See Jenkins v. State*, 248 S.W.3d 291, 295 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) ("By bearing and firing his gun in the apartment and refusing to let [the victims] leave, appellant restrained [the victims] by threatening deadly force."). Obviously, the jury could have reasonably inferred the complainant did not consent to being forced at gun point to enter the house and sit on the couch. Moreover, the fact that appellant did not bind the complainant with rope or tape is not material. *See, e.g.*, *Price v. State*, 35 S.W.3d 136, 140 (Tex. App.—Waco 2000, pet. ref'd) (concluding defendant's placing victim in bathroom and later behind bed sufficient to prove restraint). Neither is the fact the complainant was restrained for a relatively short duration. *See Santellan v. State*, 939 S.W.2d 155, 163 (Tex. Crim. App. 1997) ("The assailant need not have restrained the victim for any certain period of time.").

Furthermore, while being restrained, the complainant attempted to take appellant's gun but was shot in the process. We conclude this evidence supports a finding that the complainant's murder occurred while appellant was in the course of committing kidnapping. *See Herrin v. State*, 125 S.W.3d 436, 440–41 (Tex. Crim. App. 2002) (explaining that under capital-murder statute, defendant "must have been in the course of kidnapping or attempting to kidnap [the victim] when he murdered [the victim]").

Having determined the evidence is sufficient to support a finding that the murder occurred while appellant was committing one of the seven enumerated felonies, we need not consider the sufficiency of evidence supporting the other six felonies. We overrule appellant's second issue.

### III. RIGHT TO UNANIMOUS JURY VERDICT

In his third issue, appellant contends the trial court erred by overruling his request that the State elect which underlying felony it would rely upon to establish capital murder. According to appellant, the trial court violated his constitutional and statutory rights to a unanimous verdict by allowing the jury to find him guilty of capital murder if he intentionally committed murder during the course of committing or attempting to

11

commit any one of seven separate felonies involving three different victims. *See* Tex. Const. art. V, § 13; Tex. Code Crim. Proc. Ann. art. 36.29(a) (West Supp. 2011).

Appellant argues his right to jury unanimity was violated because the jury could have unanimously found that appellant intentionally murdered the complainant (the predicate murder) but been divided regarding whether appellant committed the underlying felony against the complainant (same victim as the predicate-murder victim) or Marcus or Charles (different victims than the predicate-murder victim). Apparently, appellant contends that the complainant's alleged murder during the course of Marcus's burglarization, kidnapping, and robbery and Charles's kidnapping and robbery were separate capital-murder offenses, not merely multiple theories of the same capital-murder offense. We disagree.

It is not a violation of the defendant's right to a unanimous jury for the trial court to submit disjunctively "all alternate theories of capital murder contained within § 19.03, whether they are found in the same or different subsections, *so long as the same victim is alleged for the predicate murder*." *Gamboa v. State*, 296 S.W.3d 574, 582–84 (Tex. Crim. App. 2009) (emphasis added). "Nothing prohibits a single capital murder from containing *alternate underlying offenses that are the same statutory offense but with different victims* or different underlying methods of commission, so long as the same victim is alleged with respect to the predicate murder." *Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010) (emphasis added).[6] Accordingly, the trial court did not violate appellant's right to a unanimous verdict by failing to order the State to elect a single underlying felony upon which to base its capital-murder case. We overrule appellant's third issue.

---

[6] After making this statement, the Court of Criminal Appeals rejected the defendant's argument under a separate legal theory. However, even assuming this statement was dictum, we are bound to follow the statement as "judicial dictum" because it constitutes a deliberate and unequivocal declaration of the law made after mature consideration and for the future guidance of the bench and bar. *See Murray v. State*, 261 S.W.3d 255, 257 (Tex. App.—Houston [14th Dist.] 2008), *aff'd*, 302 S.W.3d 874 (Tex. Crim. App. 2009).

## IV. VOLUNTARINESS OF CUSTODIAL STATEMENT

In his fourth and final issue, appellant contends the trial court erred by admitting his custodial statement because he did not make the statement knowingly, intelligently, and voluntarily.

The trial court denied appellant's voluntariness objection following a suppression hearing but did not enter findings of fact or conclusions of law. On the State's motion, we abated this appeal for the trial court to enter findings of fact and conclusions of law pursuant to article 38.22. Tex. Code Crim. Proc. Ann. art. 38.22, § 6 (West 2005) (requiring trial court to make specific findings of fact when voluntariness of statement challenged); *see also Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004). We have received the trial court's findings of fact and conclusions of law and the original exhibit of appellant's video-recorded custodial statement. *See St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007) (noting video recordings are particularly helpful when reviewing contested suppression issues).

### A. Standard of Review

When a trial court enters findings of fact after denying a motion to suppress, we must first determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports these fact findings. *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009). If the findings are supported by the record, we afford almost total deference to the trial court's determination of historical facts. *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006). We afford the same deference to mixed questions of law and fact, such as whether a statement was voluntary, if resolution of those ultimate questions turns on evaluation of credibility and demeanor. *Keehn*, 279 S.W.3d at 334; *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000). But when the resolution of mixed law and fact questions does not depend upon an evaluation of credibility and demeanor, we conduct a de novo review. *Keehn*, 279 S.W.3d at 334.

We examine the totality of circumstances when determining whether a statement

was voluntary. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). Furthermore, we apply the deferential standard of review to a trial court's determination of historical facts even when that determination is based on a videotape recording admitted into evidence during a suppression hearing. *Montanez*, 195 S.W.3d at 109.

## B. Analysis

Appellant argues the evidence established that he did not knowingly, intelligently, and voluntarily waive his rights prior to making his statement because (1) the officers continued to interrogate appellant even after he requested counsel, (2) the officers purposefully avoided answering appellant's question regarding whether he should request an attorney or have an attorney appointed, (3) the officers never asked appellant if he could afford to hire counsel, (4) the officers never informed appellant regarding the consequences of a capital-murder allegation, (5) the officers coerced appellant to give a statement by explaining the warnings are precautions for appellant and police "so we all know where the playing field is" and appellant's statement can be used against him at trial "if [he] has a trial," and (6) the testifying officer was unable to recall how appellant responded to each individual warning read to him prior to the recorded statement.

We interpret appellant's complaint as challenging the voluntariness of his statement under article 38.22, section 6 (general voluntariness) and *Miranda v. Arizona* as expanded in article 38.22, section 3 (warnings required for admission of oral statement). *See* Tex. Code. Crim. Proc. Ann. art. 38.22, §§ 3, 6; *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). We must determine, from the totality of the circumstances, whether appellant knowingly, intelligently, and voluntarily waived his rights. *See Oursbourn v. State*, 259 S.W.3d 159, 170–72 (Tex. Crim. App. 2008); *Delao*, 235 S.W.3d at 239.

We first consider whether the officers continued to interrogate appellant after he requested counsel and avoided answering his questions regarding his right to counsel. The following exchanges occurred during appellant's video-recorded statement:

14

[Appellant:] Well, should I hire a lawyer before I make a statement[?]

[Officer 1:] You know what, . . . that's . . . something . . . you have to reconcile with yourself[.]

[Appellant:] So I should ask for a lawyer[?]

[Officer 2:] That's your decision.

[Officer 1:] That's completely up to you.

. . .

[Officer 1:] If you are unable to employ a lawyer, you have a right to have a lawyer appointed to advise you prior to and during questioning. Do understand that?

[Appellant:] Yes. So if I don't have any money right now, I can have someone come appoint me a lawyer, that's what that means?

[Officer 2:] You can have a lawyer appointed to you. Yes, that's a possibility.

. . .

[Officer 1:] These are protections for you and they're also protections for me so we all know where the playing field is, okay? [The first one is] you have the right to remain silent or not make any statement at all. Any statement you make may be used against you at your trial. You understand that?

[Appellant:] Whatever I say can be used in trial.

[Officer 1:] It can be.

[Officer 2:] If you have a trial.

[Officer 1:] If you have one. We don't even know if it's gonna go that far.

[Appellant:] Yes sir.

[Officer 1:] Remember, your story.

[Appellant:] Yes sir.

. . .

[Officer 1:] In order for you to tell me your side of the story, you have to tell me you're willing to waive your right to counsel, talk to me, keeping in mind you can stop talking to me whenever you want to.

[Officer 2:] You waive all your rights for purposes of this statement. You know what waive means?

[Appellant:] Mmm hmm. Yes sir.

[Officer 2:] . . . It means you understand your rights and you agree to knowingly, intelligently, and voluntarily waive these rights in order to speak to us. Make sense?

[Officer 1:] . . . Like we said before, we're just here to find out . . . your side of the story, and that's it. That's it.

[Appellant:] Yes sir.

[Officer 1:] Okay, you want to give that statement, about what happened?

Appellant then offered his account of the complainant's shooting.

Appellant's statement "should I hire a lawyer before I make a statement" was merely a question, not an unequivocal invocation of his right to counsel. *See Davis v. United States*, 512 U.S. 452, 458–59, 462 (1994) (holding defendant's question, "Maybe I should talk to a lawyer," too equivocal to constitute an invocation of right to counsel); *Davis*, 313 S.W.3d at 338–41 (same); *Gutierrez v. State*, 150 S.W.3d 827, 832 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (same). The officers correctly answered appellant's inquiries by explaining it was appellant's decision whether to request an attorney and that an attorney may be appointed if appellant is unable to afford representation. Moreover, appellant cites no authority to support his contention that the officers should have inquired about appellant's financial situation and advised him further regarding his right to counsel and the consequences of a capital-murder charge. *See Penry v. State*, 903 S.W.2d 715, 745–46 (Tex. Crim. App. 1995) (concluding, under the circumstance, officers did not have obligation to ask follow-up question to ensure appellant understood his rights).

We also conclude the officers' comments that warnings were given "so we all know what the playing field is" and appellant's statement may be used against him at trial "if [he has] a trial" did not render appellant's statement involuntary. The officers never promised appellant any benefit for making a statement. Appellant clearly expressed that he understood his rights and readily told the officers his account of the underlying offense. In fact, appellant even acted out the shooting for the officers. *See Davis*, 313

S.W.3d at 338 (considering defendant's eagerness to speak with police as supporting conclusion defendant waived rights freely).

Finally, appellant complains about the testifying officer's inability to recall how appellant responded to each individual *Miranda* warning read to him prior to the video-recorded statement. However, the officer's testimony supports the trial court's findings that, prior to the video-taped statement, (1) the officers read appellant his warnings, (2) the officers did not coerce or threaten appellant, nor did appellant request counsel, (3) the officers questioned appellant to determine whether he knew anything about the underlying incident and to inform him they wanted his version of the incident, and (4) appellant agreed to speak with the officers.

In sum, examining the totality of the surrounding circumstances, we conclude the trial court did not err by concluding appellant made his statement knowingly, intelligently, and voluntarily. Appellant's fourth issue is overruled.

We affirm the trial court's judgment.


/s/      Charles W. Seymore
Justice


Panel consists of Justices Seymore, Boyce, and Mirabal.[7]
Do Not Publish — Tex. R. App. P. 47.2(b).

---

[7] Senior Justice Margaret Garner Mirabal sitting by assignment.